Timothy Kingston
WY Bar No. 5-2476
LAW OFFICE OF TIM KINGSTON, LLC
620 East 27th
Cheyenne, WY 82001
TEL: (307) 638-8885
FAX: (307) 637-4850

Counsel for Petitioners

William S. Eubanks II
D.C. Bar No. 987036; *pro hac vice* submitted
MEYER GLITZENSTEIN & EUBANKS LLP
2601 S. Lemay Ave., Unit 7-240
Fort Collins, CO 80525
(970) 703-6060 / (202) 588-5049 (fax)
beubanks@meyerglitz.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

STEPHAN HARRIS, CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN CAMPAIGN<br>P.O. Box 1733<br>Davis, CA 95617,<br><br>CAROL WALKER<br>16500 N. Dakota Ridge Rd.<br>Longmont, CO 80503,<br><br>KIMERLEE CURYL<br>P.O. Box 1802<br>Santa Ynez, CA 93460<br><br>    Petitioners,<br><br>  v.<br><br>RYAN ZINKE, Secretary<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>MICHAEAL NEDD, Acting Director<br>Bureau of Land Management<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>    Respondents. | Civ. No. 17-cv-170-F |

## PETITION FOR REVIEW

1.      For the third time since 2014, Petitioners American Wild Horse Campaign

("AWHC"), and professional wildlife photographers Carol Walker and Kimerlee Curyl, are

filing suit in this Court to challenge the Bureau of Land Management's ("BLM") unlawful

actions to permanently remove federally protected wild horses from the public lands of the

Wyoming Checkerboard within the Adobe Town, Salt Wells Creek, and Great Divide Basin

Herd Management Areas ("HMA") without complying with various statutory obligations that

Congress required before BLM may remove any wild horses from the range.  Notwithstanding

the October 24, 2016 ruling by the U.S. Court of Appeals for the Tenth Circuit holding that BLM

may only remove from the range those wild horses specifically determined by BLM to be

"excess" animals as defined by the Wild Free-Roaming Horses and Burros Act ("Wild Horse

Act"), 16 U.S.C. §§ 1333(b)(2), 1332, and further holding under the Federal Land Policy and

Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, that BLM may not manage these HMAs

below the legally established appropriate management levels ("AML") defined in the agency's

Resource Management Plans ("RMP") that apply to these public lands, *see Am. Wild Horse*

*Preservation Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016), BLM has authorized a

roundup action which, based on recently obtained information, includes BLM permanently

removing wild horses from the range that were never determined to be "excess" animals under

the Wild Horse Act and, as a result, threatens to once again illegally drive these wild horse

populations below the AMLs for these HMAs.  In addition, because BLM's Environmental

Assessment ("EA") fails even to disclose—much less analyze—the removal of non-excess

horses and the potential for this population to be driven below AML (among other reasons),

BLM's action also violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

4321-4370m, in several distinct ways.

2.      In particular, this case challenges BLM's August 29, 2017 Decision Record

("2017 Decision Record") and accompanying EA and Finding of No Significant Impact

("FONSI"), as well as BLM's ongoing actions being taken pursuant to that Decision Record,

related to the permanent removal of federally protected wild horses from the Adobe Town, Salt

Wells Creek, and Great Divide Basin HMAs.  This is BLM's first wild horse roundup and

removal in these HMAs since the Tenth Circuit issued its decision last year.  Although BLM's

new approach is consistent with the Tenth Circuit's ruling (and federal law) insofar as BLM

actually invoked Section 3 of the Wild Horse Act with respect to the removal of wild horses

from public lands in these HMAs, the new approach suffers from many of the same legal defects

as the prior action invalidated by the Tenth Circuit because post-decisional information obtained

from BLM officials at the roundup site indicates that BLM will be—and already is—

permanently removing wild horses from the range that the agency never determined to be

"excess" animals and which, in turn, also threatens to take these populations below AML in

violation of law.

3.      This roundup began on September 23, 2017 and BLM estimates that it will last

four to six weeks.  Although the decision documents clearly state that BLM intends to

permanently remove 1,560 adult horses that the agency determined to be "excess" animals that

must be removed to achieve a thriving natural ecological balance, BLM officials at the roundup

site have represented—and the agency's daily gather reports posted on its website have

confirmed—that BLM is *also* permanently removing several hundred wild horse foals (i.e.,

horses born in 2017) *in addition to* the 1,560 adult horses BLM deemed excess in its decision

documents.  Based on estimates provided by BLM officials at the roundup site—which suggest

that up to 20% of the total number of horses removed from these HMAs would be foals—

3

approximately 312 wild horses would be permanently removed (in addition to the 1,560 adult horses determined to be excess animals), without any public disclosure of that salient fact or any analysis under NEPA as to the significant impacts to these hundreds of foals individually, their wild horse bands, and the social relationships between the horses in those bands (and in particular the relationships between mothers and their foals), as well as the natural resources (e.g., forage, water, other wildlife) located in these HMAs.  BLM's new approach in the Checkerboard—removing all captured foals *in addition to* the requisite number of adult horses necessary to achieve low AML—not only threatens to drive these populations severely below AML in the same manner invalidated by the Tenth Circuit, but it also constitutes an unexplained and arbitrary reversal of longstanding agency policy and practice.

4.      In yet another unexplained, arbitrary, and legally deficient shift in longstanding agency practice, BLM—without any discussion whatsoever in the decision documents—is sending captured horses from this roundup to private holding facilities in Bruneau, Idaho and Axtell, Utah, neither of which provide public access to observe these federally protected wild horses that are being managed with taxpayer dollars.  In stark contrast to prior wild horses roundups in the Wyoming Checkerboard and elsewhere when BLM ensured that the public had full access to BLM holding facilities where the agency managed captured wild horses and prepared them for adoption, BLM's action of sending these horses to facilities that are closed to the public is, at minimum, a drastic and unexplained departure from BLM's longstanding practice in the Checkerboard, which the agency also failed to disclose and analyze under NEPA.

5.      Upon discovering this new information from BLM officials at the roundup site late last week concerning the agency's treatment of foals and its shipping of captured horses to private facilities with no public access, Petitioners submitted a formal demand letter to BLM and

4

its legal counsel at the Department of Justice requesting that BLM postpone implementation of this action until the agency comes into compliance with federal law and the Tenth Circuit's ruling. *See* Exhibit A (Petitioners' Oct. 2, 2017 Demand Letter). Despite Petitioners' attempts to avoid burdening the Court with another lawsuit regarding BLM's unlawful management of wild horses in the Wyoming Checkerboard, BLM responded to Petitioners' demand letter very late on October 5, 2017 and refused to postpone this action.

6.      For these reasons and those explained below, BLM's new approach to permanently removing federally protected wild horses from the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs violates the Wild Horse Act, FLPMA, NEPA, the RMPs, and the Tenth Circuit's ruling in *Jewell*. Accordingly, BLM's 2017 Decision Record, EA, and FONSI must be set aside under the Administrative Procedure Act ("APA") as agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

8.      Petitioner American Wild Horse Campaign ("AWHC") is a national wild horse advocacy organization whose grassroots mission is endorsed by a coalition of more than sixty horse advocacy, public interest, and conservation organizations. Supporters of AWHC and partner coalition organizations enjoy viewing wild horses on public lands, including in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs, for observation, photography, recreational, and educational purposes. On behalf of its supporters, AWHC also regularly submits comments on various BLM actions related to the management of wild horses, such as

decisions analyzing and authorizing removal of wild horses from the range. AWHC was the lead

petitioner in two previous lawsuits in this Court that successfully challenged BLM's unlawful

wild horse removals from the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs,

which culminated in the Tenth Circuit's favorable ruling in AWHC's favor in *Jewell*.

9.     AWHC also has a long and substantial history of documenting BLM's

management of wild horse populations (including in holding facilities) and disseminating this

information to the public through press releases, websites, videos, photographs, and other media.

In fact, AWHC's videos of prior management of wild horse populations by BLM, which AWHC

circulated to the public, led BLM to review and revise certain practices to make them more

humane. For example, after AWHC documented and publicly disseminated videos of BLM

personnel or agents engaged in such inhumane activities as hitting, kicking, and beating wild

horses that had been removed from the public lands, deliberately slamming gates and doors on

wild horses, and using electric prods on horses, BLM expressly prohibited these activities.

AWHC thus serves as an important public observer of BLM's wild horse population

management, safeguarding wild horses as well as the public's interest in their welfare, and

promoting responsible government behavior.

10.     BLM's decision—albeit unanalyzed in the agency's Decision Record, EA, and

FONSI—to permanently remove from these HMAs several hundred wild horse foals in addition

to 1,560 adult wild horses that BLM determined to be excess animals directly harms AWHC's

organizational interests and the interests of its coalition partners and supporters in protecting and

preserving viable free-roaming herds of wild horses on public lands, and their aesthetic interests

in observing and photographing wild horses engaging in their natural behaviors on these public

lands. BLM's failure to make an "excess" determination under the Wild Horse Act concerning

6

these hundreds of foals—and BLM's failure to subject that precedential decision to public scrutiny or comment—adversely affects AWHC and its supporters by depriving them of information related to the environmental effects of the permanent removal of hundreds of wild horses from the public Checkerboard lands. In addition, BLM's failure to provide public access to captured wild horses following this roundup thwarts AWHC's ability to observe these horses and their health under BLM's management, and also compromises AWHPC's ability to document for AWHC's supporters and the broader public BLM's treatment of these horses after the roundup concludes. In all of these ways, BLM's decision irreversibly harms AWHC's cognizable interests in these federally protected wild horses and also seriously undermines AWHC's organization mission.

11.     A court order enjoining BLM from rounding up, removing, and otherwise harassing non-excess wild horses—and action that has never been analyzed under NEPA—will protect AWHC's interests and those of its supporters and coalition partners in the welfare and continued existence of viable free-roaming herds of wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs, and allow AWHC and its supporters to be able to observe and otherwise enjoy the wild horse herds on these public lands and/or in holding facilities until such time as they are adopted. Requiring BLM to conduct a lawfully appropriate environmental analysis would also provide AWHC, as well as its coalition partners and supporters, with crucial information concerning the potential environmental ramifications of such action and would afford AWHC with the opportunity to meaningfully participate in BLM's decisionmaking process.

12.     Petitioner Carol Walker is a photographer with professional and personal interests in the wild horse herds in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs.

She is also a board member of the Wild Horse Freedom Federation, a nonprofit organization

dedicated to preventing wild equine extinction.  She has spent her career photographing wild

horses, particularly horses exhibiting wild and natural behaviors on the range.  She sells fine art

prints, calendars, and books of her photographs of wild horses engaging in their natural

behaviors.  A book of Ms. Walker's photographs was published in France in 2014, titled

*Mustang: The Heart of an American Legend*, which includes photographs taken in these three

HMAs.

     13.    Ms. Walker has visited the wild horses in the Great Divide Basin, Adobe Town,

and Salt Wells Creek HMAs several times a year since 2004.  Most recently, she visited the

Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs in September 2017 to observe

BLM's roundup that is challenged in this lawsuit.  Ms. Walker also has routinely visited the

Rock Springs Corrals and Canon City—where BLM has historically held wild horses removed

from these HMAs with full public access—in order to observe and document BLM's

management of wild horses and the conditions of the captured horses after various roundups.

Indeed, in 2014, Ms. Walker photographed captured horses from these HMAs at both the Rock

Springs and Canon City holding facilities and made those photographs available to the public,

which significantly increased adoptions and sales of these horses.  She has concrete plans to

regularly return to observe the wild horses in these HMAs, both for her personal aesthetic

interests in observing the wild horses and to pursue her professional and economic interests in

photographing these animals.  Ms. Walker would also make concrete plans to visit the captured

horses in BLM's holding facilities if they were open to the public for observation, photographs,

and documentation of their condition.  In addition, Ms. Walker has concrete plans to adopt an

older stallion with which she is personally familiar in the event that he is captured as part of

BLM's action—i.e., the father of one a mustang Ms. Walker adopted several years ago and which Ms. Walker has regularly photographed—but the shipping of captured horses to private facilities may make it impossible for Ms. Walker to locate this horse before he is adopted or sold to another party, which would cause her irreversible and severe harm.

14.     BLM's actions will seriously impair Ms. Walker's aesthetic, recreational, economic, and occupational interests in observing and photographing wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. BLM's action of removing hundreds of foals—in addition to those horses deemed excess by BLM—will dramatically reduce her ability to observe and photograph wild horses in these HMAs, because there will be far fewer wild horses remaining after BLM fully implements its decision. Moreover, BLM's action of prohibiting Ms. Walker from accessing and observing captured horses in post-roundup holding facilities also significantly harms her interests, as well as her ability to document BLM's treatment of these horses and disseminate that information to the public. A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses—and ensuring public access to any captured horses—will redress the many personal and professional harms that this decision will cause Ms. Walker, and in the process protect Ms. Walker's ability to enjoy, photograph, and study these horses on the range and in holding facilities.

15.     Petitioner Kimerlee Curyl is a photographer with a professional and personal interests in the wild horse herds in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. She has spent her career photographing wild horses in hopes of inspiring others to preserve their place on the range. She sells fine art prints of wild horses and has exhibited her photographs in galleries across the country. Her work has also been used in advertising and product branding campaigns. In addition, she taught an equine photography workshop for eight

years at a California sanctuary dedicated to preserving intact wild horse families (referred to as "bands"). Ms. Curyl has visited the wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs several times, most recently in June 2016. She has concrete plans to regularly return to observe the wild horses in these HMAs, both for her personal aesthetic and recreational interests in observing the wild horses and to pursue her professional interest in photographing these animals.

16.     BLM's decision impairs Ms. Curyl's aesthetic, recreational, economic, and occupational interests in observing and photographing wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. Implementation of BLM's decision will dramatically reduce her ability to photograph wild horses in these HMAs, because there will be far fewer wild horses once BLM permanently removes them from these HMAs in numbers that may result in these areas dropping below the prescribed AMLs, making it far less likely Ms. Curyl will be able to observe and photograph wild horses on the public land in these areas. A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses will redress the harms caused to Ms. Curyl by this decision, and in the process will protect Ms. Curyl's ability to enjoy, photograph, and study these horses in their natural habitat.

17.     Defendant Ryan Zinke is the Secretary of the Department of the Interior, the parent agency of BLM, and, accordingly, is ultimately responsible for the decision challenged here.

18.     Defendant Michael Nedd is the Director of BLM, which is the agency that made the decision at issue, and therefore is also responsible for the decision at issue.

## STATUTORY AND REGULATORY FRAMEWORK

### A.      The Wild Free-Roaming Horses and Burros Act

19.      Congress enacted the Wild Horse Act in 1971 out of concern that wild horses were quickly "disappearing from the American scene." 16 U.S.C. § 1331. Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West" and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people." *Id.* As a result, by enacting the Wild Horse Act, Congress sought to guarantee that "wild free-roaming horses and burros *shall be protected* from capture, branding, harassment, [and] death," and "be considered in the area where presently found, as an *integral part of the natural system of the public lands.*" *Id.* (emphasis added). To implement this mandate, Congress required that BLM "shall manage wild free-roaming horses and burros as components of the public lands," and provided that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

20.      BLM manages wild horses on public lands within certain types of management areas, one of which is a herd management area ("HMA"). An HMA is "established for the maintenance of wild horse and burro herds," 43 C.F.R. § 4710.3-1, based on the geographic areas that were used by these animals in 1971 when the Wild Horse Act was enacted or as amended by BLM since that time in RMPs. 43 C.F.R. § 4700.0-5(d).

21.      The Wild Horse Act requires BLM to "manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). In accordance with this mandate, for each HMA, the Secretary must: (1) maintain a current inventory of wild horses in the management area, (2) "determine [the] appropriate management

11

level" ("AML") of wild horses that the HMA can sustain, and (3) determine the method of

achieving the designated AML and managing horses within that AML.  16 U.S.C. § 1333(b)(1);

43 C.F.R. §§ 4710.2, 4710.3-1; *see* BLM, Wild Free-Roaming Horses and Burros Management

Manual ("BLM Manual") § 4710.45 (procedures for conducting population inventories.).

22.    An AML is "expressed as a population range within which [wild horses] can be

managed for the long term" in a given HMA without resulting in rangeland damage.  *See* BLM

Handbook § 4.2.1.  The upper limit of the AML is "the maximum number" of wild horses within

a given HMA that "results in a [thriving natural ecological balance] and avoids a deterioration of

the range." *Id.*  The lower limit of the population range is "established at a number that allows

the population to grow (at the annual population growth rate) to the upper limit over a 4-5 year

period, without any interim gathers." *Id.*  When calculating the AML for a particular HMA,

BLM only counts adult wild horses towards the AML; as stated in BLM's Handbook, "AML

applies to then number of adult wild horses or burros to be managed within the population and

*does not include current year's foals.*"  BLM Handbook H-4700-1 § 4.2.1 (emphasis added).

The reason that BLM excludes foals from counting towards the AML until the January 1 in the

year after their birth is that a foal utilizes much less forage and water than an adult horse and thus

an HMA is still within AML—and maintaining a thriving natural ecological balance—even

when the adult population is at the high end of the AML.

23.    BLM may only modify an AML after "[a]n interdisciplinary and site-specific

environmental analysis and decision process (NEPA) with public involvement," which is

ordinarily done during the land-use planning process when amending the governing RMP.  BLM

Handbook at 18.

24.     Section 3 of the Wild Horse Act allows BLM to manage wild horses by removing "excess" animals from "a given area of the public lands," but only after BLM specifically determines that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove *excess* animals."  16 U.S.C. § 1333(b)(2) (emphasis added).  The Wild Horse Act defines "excess" horses as those "which must be removed from any area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  16 U.S.C. § 1332(f).

25.     Once BLM makes an "excess determination," it may remove from public lands only those "excess animals from the range so as to achieve appropriate management levels."  16 U.S.C. § 1333(b)(1); *see also id.* (BLM must use the wild horse inventories to "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals.").  According to BLM's own Handbook, "[w]ild horses or burros should generally *not be removed below the AML lower limit*."  BLM Manual 4720.2(21)(B) (emphasis added); BLM Handbook at 17 (wild horse removals should be conducted to "maintain population size within AML.").  Courts have held that "Congress clearly intended to protect non-excess wild free-roaming horses and burros from removal, and that BLM's removal authority is limited to those wild free-roaming horses and burros that it determines to be 'excess animals' within the meaning of the Wild Horse Act." *Colo. Wild Horse & Burro Coal. v. Salazar*, 639 F. Supp. 2d 87, 95-96 (D.D.C. 2009); *see also id.* at 98 ("A prerequisite to removal under the Wild Horse Act is that BLM first determine that an overpopulation exists and that the wild free-roaming horses and burros slated for removal are 'excess animals.'").

26.     Removal of wild horses below low AML is warranted only when an adequate NEPA analysis subject to public participation indicates that "additional animals need to be

removed to protect land health, wildlife habitat and the health of horses and burros remaining on the public land" or "in emergency situations based on limited forage, water, or other circumstances." BLM Manual 4720.2(21)-.2(22). In order for the agency to exercise its limited authority to remove horses below low AML, it must not only conduct "[a]n appropriate NEPA analysis and issuance of a decision . . . prior to removing the animals," but must also provide a compelling "[r]ationale to justify a reduction below the AML lower limit . . . [which] should include a discussion of the available forage, water and any other limiting factors." *Id.*

**B.   The National Environmental Policy Act**

27.   NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c). In particular, Congress enacted NEPA to ensure that federal agencies consider and analyze: (1) the full environmental impacts of their actions before taking them, and (2) alternatives to proposed actions that may have less adverse impacts on the environment.

28.   The Council on Environmental Quality—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies." *Id.* § 1500.3.

29.   To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS must describe (1) "the

14

environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii).

30.     In evaluating a proposed action, NEPA requires that agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16. The EIS must assess the direct, indirect, and cumulative impacts of the proposed action on the environment, including adverse environmental effects that cannot be avoided, *id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

31.     To determine whether an EIS is required for a proposed action, an agency may prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as reasonable alternatives to the proposed action. *See* 40 C.F.R. §§ 1501.4(c), 1508.9. The EA must analyze both the "direct" impacts of the proposed action, i.e., those that result directly from the management action, as well as the "indirect" impacts, which include those caused by the action that are later in time but are "still reasonably foreseeable." 40 C.F.R. § 1508.8(a)-(b). The EA must also analyze cumulative effects. *See* 40 C.F.R. § 1508(b).

32.     When an agency determines that an EIS is not required, it must issue a Finding of No Significant Impact ("FONSI"), which must provide the reasons why the agency has determined that its proposed action "will not have a significant impact" on the environment. 40 C.F.R. § 1508.13.

33.     Public disclosure of important information concerning an agency's proposed action, its impacts, and reasonable alternatives to the action is central to NEPA's statutory and regulatory scheme, regardless of whether an agency prepares an EIS or an EA.  For example, the CEQ regulations require that federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment," 40 C.F.R. § 1500.2, and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* § 1506.6(a).  Thus, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b).  Accordingly, NEPA's implementing regulations explain that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

C.     **Administrative Procedure Act**

34.     The APA provides for judicial review of agency action.  Under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law. *See id.* § 706(2)(D).

## FACTUAL BACKGROUND

**A.    The Adobe Town, Salt Wells Creek, and Great Divide Basin Herd Management Areas**

35.    The Adobe Town HMA is managed by BLM's Rawlins Field Office under the 2008 Rawlins Resource Management Plan ("Rawlins RMP"). The Adobe Town HMA consists of a patchwork of 417,916 acres of federal public lands and 30,000 acres of non-federal, mostly private lands located in Carbon and Sweetwater counties in southwest Wyoming. The northern portion of the Adobe Town HMA, which includes both public and private land, consists of a continuously alternating checkerboard pattern of federal parcels and private parcels of approximately one-mile by one-mile squares. The vast majority of this HMA consists of a large solid public land block without any private lands found therein.

36.    The 2008 Rawlins RMP, which was subject to public scrutiny through notice and comment procedures, established that BLM must "[m]aintain wild horse populations within the appropriate management levels (AML) of [any given] HMA" covered by the plan. BLM, Rawlins Resource Management Plan (Dec. 2008) at 2-51. As a result, the RMP requires that BLM "[c]onduct regular, periodic gathers *when necessary to maintain AMLs*." *Id.* (emphasis added). The Rawlins RMP set the operative AML for the Adobe Town HMA at 700 wild horses, which is accomplished by an AML range of 610-800. *Id.*

37.    The Salt Wells Creek HMA ("Salt Wells HMA") is managed by BLM's Rock Springs Field Office under the 1997 Green River Resource Management Plan ("Green River RMP"). The Salt Wells HMA consists of a patchwork of 690,400 acres of federal public lands and 480,308 acres of non-federal, mostly private lands located in Carbon and Sweetwater counties in southwest Wyoming. As in the northern portion of the Adobe Town HMA, the public and private lands of the Salt Wells Creek HMA—located in the northern portion of the

17

HMA—are approximately one-mile by one-mile square plots that alternate continuously, forming a checkerboard pattern. This HMA also contains a solid public land block outside of the Checkerboard.

38.     The Green River RMP established that BLM will manage wild horses "within five Wild Horse Herd Management Areas," including the Salt Wells HMA.  BLM, Green River Resource Management Plan (Oct. 1997) at 23; Map 27.  This RMP further requires that the applicable AML, which was the product of NEPA review and public participation, be "maintained among the five herd management areas" covered by the plan. *Id.*  The Green River RMP determined that the governing AML for the Salt Wells HMA is 251-365. *Id.* at 73, Table 15; *see also* BLM Wyoming Herd Management Areas Map.

39.     The Great Divide Basin HMA is also managed by BLM's Rock Springs Field Office under the Green River RMP.  The Great Divide Basin HMA encompasses a patchwork of 561,919 acres of federal public lands and 196,640 acres of private land located in Sweetwater and Freemont counties in southwest Wyoming.  The southern portion of the Great Divide Basin HMA consists of both public and private land in a continuously alternating checkerboard pattern of federal parcels and private parcels of approximately one-mile by one-mile squares.  This HMA also contains a large solid public land block outside of the Checkerboard.

40.     The Green River RMP determined that the appropriate AML for the Great Divide Basin HMA is 415-600.  Green River RMP at 73, Table 15.

41.     Parts of the Adobe Town, Salt Wells, and Great Divide Basin HMAs are included within what is referred to as the "Wyoming Checkerboard" because of the alternating parcels of public and private land.  Within these three HMAs, there are approximately 1,695,517 acres of

public lands and 731,703 acres of private lands, meaning that 70% of the lands in these HMAs are public and only 30% are private.

     42.    A private trade organization called the Rock Springs Grazing Association ("RSGA") currently owns or controls approximately 731,703 acres of the Checkerboard lands within the Adobe Town, Salt Wells, and Great Divide Basin HMAs.

### B.    The *RSGA* Litigation and the Resulting 2013 Consent Decree Between BLM and RSGA

     43.    On July 27, 2011, RSGA filed a Petition for Review in this Court seeking to compel BLM to "remove all of the wild horses that have strayed onto the RSGA lands within the Wyoming Checkerboard." Petition for Review, *Rock Springs Grazing Ass'n v. Salazar* ("RSGA Case"), No. 2:11-cv-263935, F. Supp. 2d 1179 (D. Wyo. 2013), ECF No. 1. The Petition for Review explained that RSGA brought the case because it was informed by the Assistant Secretary for the Department of Interior that "litigation would be necessary to secure additional funding for wild horses gathers." *Id.* at ¶ 70.

     44.    On February 12, 2013, BLM and RSGA reached a settlement, and filed a Joint Motion to Dismiss and a Consent Decree. Joint Motion to Dismiss, *RSGA Case*, ECF No. 81; Proposed Consent Decree, ECF 81-1. On April 3, 2013, this Court approved the Consent Decree finding that it did not "on its face violate law or public policy." 935 F. Supp. 2d at 1191. Focusing on paragraph 10 of the Consent Decree, the Court concluded that "the Consent Decree expressly prohibits any construction which would 'limit or modify the discretion accorded to BLM by the applicable federal law and regulations.'" *Id.* at 1189.

### C.    BLM's 2014 Checkerboard Roundup

     45.    In late 2013, BLM solicited public comment on a scoping statement for a wild horse roundup from these HMAs. However, in response to criticism by RSGA, BLM radically

altered its approach and decided not to "gather the Great Divide Basin HMA to low appropriate

management level under Section 3 of the WHA" but instead to "gather all wild horses from the

checkerboard within the HMAs as required by Section 4 of the WHA and the Consent Decree."

BLM, 2014 Decision Record. In turn, BLM abandoned the NEPA process concerning a roundup

of excess wild horses in the Great Divide Basin HMA.

46.     On July 18, 2014, BLM issued the 2014 Decision Record and a Categorical

Exclusion authorizing the "removal of all wild horses from Checkerboard Lands within the Great

Divide Basin, Adobe Town, and Salt Wells Creek Herd Management Areas." 2014 Decision

Record. BLM based that decision only on its authority under Section 4 of the Wild Horse Act,

which only applies to private lands. *See* 16 U.S.C. § 1334. BLM made clear in its 2014 Decision

Record that the removal would not just occur on private lands within the Checkerboard; rather

BLM "acknowledge[d] that in discharging its duties under Section 4 of the WHA wild horses

*will also be removed from the public land* portions of the Checkerboard." 2014 Decision

Record. However, BLM never made any specific determination that the wild horses found on

public lands constituted "excess" horses, as is required by Section 3 of the Wild Horse Act

before any wild horse can be permanently removed from public lands. In addition, BLM made

clear that its action would drive the populations in these HMAs far below the legally established

AMLs contained in the agency's own RMPs.

### D.     Petitioners' Lawsuit Concerning BLM's 2014 Decision Record

47.     Petitioners filed a Petition for Review with this Court challenging BLM's 2014

Decision Record on Wild Horse Act, FLPMA, and NEPA grounds. *See Am. Wild Horse*

*Preservation Campaign v. Jewell*, No. 14-cv-152 (D. Wyo.) (Freudenthal, J.). After the Court

denied Petitioners' request for preliminary injunctive relief, BLM proceeded with rounding up

20

and permanently removing 1,263 wild horses from the public and private lands of the Wyoming

Checkerboard. That action left all three HMAs far below their governing AMLs, with only 91

horses remaining in the Great Divide Basin HMA (where the low AML is 415), only 39 horses

remaining in the Salt Wells Creek HMA (where the low AML is 251), and only 519 horses in the

Adobe Town HMA (where the low AML is 610).

48.     The Court issued a merits ruling in March 2015. In that ruling, the district court

rejected Federal Respondents' mootness argument and determined that Petitioners' claims

present a live controversy because of the Court's ability to order BLM to return horses to the

range or to compel BLM to comply with various statutory procedures. *See* ECF No. 83 at 12-14.

On the merits, the Court ruled for Respondents on the Wild Horse Act and FLPMA claims, and

ruled for Petitioners as to their NEPA claims. *See id.* at 14-27. In particular, the Court found that

BLM contravened NEPA by failing to adequately consider reasonable alternatives to the action.

ECF No. 83 at 23-27. Specifically, the Court noted that in its NEPA analysis, BLM should have

looked at reasonable alternatives involving BLM's discretion to return at least *some* horses to the

public land blocks outside of the Checkerboard. *See id.* at 26 ("There is nothing in the record to

suggest that BLM had no discretion for the return of any horse."). Thus, the Court remanded the

NEPA analysis to BLM to address those deficiencies. *Id.* at 27. Respondents did not appeal the

adverse NEPA ruling.

**E.     The Tenth Circuit's Ruling in *Jewell***

49.     On October 24, 2016, the U.S. Court of Appeals for the Tenth Circuit

disseminated its ruling in *Jewell*, reversing this Court's findings under the Wild Horse Act and

FLPMA, and issuing a stinging rebuke to BLM concerning its 2014 roundup in these HMAs. In

particular, after rejecting Respondents' mootness arguments, the Court held that the Wild Horse

Act "do[es] not provide BLM with the authority to construe the Act in a manner contrary to its plain and unambiguous terms." 847 F.3d at 1188. The Court concluded that "BLM violated the duties that Section 3 clearly imposes on it with respect to wild horses found on the public land sections of the Checkerboard." *Id.* at 1189. In addition, the Court determined that BLM violated FLPMA and the operative RMPs developed pursuant to FLPMA because BLM's approach failed to maintain AML within the HMAs. *Id.* at 1189-90.

50.     As a result of the Tenth Circuit's decision, BLM cancelled its previously scheduled November 2016 wild horse roundup in these HMAs. On December 16, 2016, this Court entered judgment for Petitioners on all of their claims challenging BLM's 2014 roundup decision.

F.     **BLM's 2017 Wyoming Checkerboard Decision Record, EA, and FONSI**

51.     On August 29, 2017, BLM issued its 2017 Decision Record, EA, and FONSI authorizing a roundup and permanent removal of 1,560 wild horses from these HMAs to achieve the low AML in each HMA. This action constitutes BLM's first wild horse roundup and removal in these HMAs since the Tenth Circuit issued its ruling in *Jewell*.

52.     Addressing the Tenth Circuit's ruling in *Jewell*, BLM's 2017 Decision Record and EA specifically invoke Section 3 of the Wild Horse Act as the legal authority for removing wild horses from the public lands of these HMAs. BLM explained its understanding that the Tenth Circuit "ruled that the BLM had to comply with Section 3 of the [Wild Horse Act], including the maintenance of AML, if removing excess wild horses from public lands within the checkerboard." 2017 Decision Record at 2. Thus, applying this principle, BLM determined that "1,560 wild horses will be removed from these HMAs as a result of this action as follows: 513 from the Adobe Town HMA, 725 from the Salt Wells Creek HMA and 322 from the Great

22

Divide Basin HMA." *Id.* In turn, the EA analyzed the impacts of permanently removing 1,560 wild horses, and stated that "1,560 excess wild horses (513 in Adobe Town, 725 in Salt Wells Creek, and 322 in Great Divide Basin) would be removed and shipped to BLM holding facilities in Rock Springs, Wyoming, Cañon City, Colorado and/or any other BLM holding facility, where they would be prepared for adoption and/or sale to qualified individuals and/or long-term holding." EA at 13.

53.     In determining that 1,560 horses were "excess" horses and thus appropriate for permanent removal from the range, "[a]erial survey and distribution flights were completed in April of 2017 in the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs." EA at 7. Although the EA explained that "[t]he wild horse numbers and locations were recorded with the use of a Global Positioning System and compiled on maps," *id.*, BLM neither provided the public with these maps nor made publicly available any of the underlying data substantiating the census counts. In order to make its excess determination of 1,560 horses, BLM simply subtracted the low AML for these HMAs (1,276 combined) from the overall projected wild horse population in these HMAs based on the 2017 aerial survey (2,836 horses) for a total of 1,560 excess horses. BLM did not explain in its Decision Record or EA the major discrepancy between its 2017 aerial survey population projection of 2,836 wild horses in these HMAs and the agency's own population projection—less than three years ago—using the same census count methodology and concluding that only 649 wild horses remained in these HMAs after the 2014 roundup (far less than the 1,276 that BLM is legally required to manage on these public lands).

G.     **BLM's 2017 Roundup**

54.     BLM commenced its 2017 roundup on September 23, 2017. At the roundup site(s), BLM officials told Petitioners and other members of the public that BLM would be

removing not only 1,560 (adult) horses as explicitly determined to be excess in the agency's Decision Record and EA, but also several hundred foals *in addition to* the requisite number of horses to achieve the low AML in these HMAs. BLM's decision documents did not disclose this crucial fact to the public, nor did BLM purport in those documents to analyze the significant impacts of such an action on these hundreds of foals individually, their wild horse bands, and the social relationships between the horses in those bands (and in particular the relationships between mothers and their foals), or impacts to the natural resources (e.g., forage, water, other wildlife) located in these HMAs. BLM's new approach to permanently removing wild horses from these HMAs—i.e., removing all captured foals *in addition to* the number of adult horses necessary to achieve the lowest end of the AML for a particular HMA—radically departs from BLM's longstanding agency practice in these HMAs and elsewhere throughout the West but was never analyzed (much less acknowledged) by BLM in the Decision Record or EA.

55.     BLM officials at the roundup site(s) also informed Petitioners and other members of the public that BLM will be shipping captured horses as part of this roundup to private holding facilities in Idaho and Utah, which will not be accessible by the public in the same manner as BLM-managed facilities. This action stands in contrast to BLM's representations in the EA that these horses would only be "shipped to BLM holding facilities," EA at 13, and also contradicts the agency's longstanding practice to ensure public access to captured horses after roundups so that members of the public can observe their treatment, management, and care in such facilities and subsequently disseminate information to the public about BLM's management of horses in holding facilities.

**H.      Petitioners' Request for BLM to Postpone Implementation of the 2017
        Decision Record until Ensuring Compliance with Federal Law**

56.      On October 2, 2017, Petitioners' counsel sent a formal request to BLM asking the

agency to postpone implementation of the August 29, 2017 Decision Record until and unless

BLM comes into compliance with various federal laws that apply to this action, as well as the

Tenth Circuit's ruling in *Jewell*.

57.      Very late on October 5, 2017—i.e., the day before Petitioners filed this lawsuit—

BLM sent a response letter indicating that BLM is not willing to postpone implementation of the

2017 Decision Record to address the legal concerns raised in Petitioners' demand letter. BLM's

position in that letter—which is inconsistent with the agency's longstanding policy and practice,

and was never disclosed or analyzed in BLM's decision documents for this action—is that

"BLM's determination of whether horses are excess under Section 3 only applies to *adult*

horses" and thus BLM may remove as many foals as it wants without determining whether they

are excess horses under the Wild Horse Act or analyzing the impacts of permanently removing

those foals from the range. As to the holding facilities where captured horses will be shipped,

BLM explained that, contrary to its representations in its EA that these horses would only be

shipped to BLM-managed facilities, it has now decided to send horses to privately owned

facilities where "BLM cannot directly provide access to these facilities." Thus, BLM suggested

that Petitioners or other interested members of the public must "reach out to these contractors to

see if they can accommodate visits."

58.      As of October 6, 2017, BLM's roundup reports indicate that the agency had thus

far permanently removed 748 wild horses from these HMAs as part of this action. *See,* BLM

Daily Reports, https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-

and-removals/wyoming/2017-at-swc-gdb-wild-horse-gather. This total includes 593 adult horses

and 155 foals removed from the range as of October 4, 2017. *Id.* Also, BLM's roundup action

has resulted in the deaths of 9 horses to date. *Id.*

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – Violations of the Wild Horse Act and the APA

59.  Petitioners hereby incorporate Paragraphs 1-58 by reference.

60.  The Wild Horse Act limits BLM's authority to remove federally protected wild

horses from the range to those horses specifically determined to be "excess" horses, 16 U.S.C. §

1333(b)(2), which BLM has concluded "must be removed from any area in order to preserve and

maintain a thriving natural ecological balance." 16 U.S.C. § 1332(f). Here, BLM plans to

remove—and is in the process of removing—several hundred wild horse foals *in addition to* the

1,560 horses that BLM determined to be excess horses in the 2017 Decision Record. BLM's

permanent removal of non-excess horses violates the Wild Horse Act, 16 U.S.C. § 1333(b)(2), its

implementing regulations, *see* 43 C.F.R. § 4720.1, BLM's own longstanding practice, and the

APA, 5 U.S.C. § 706(2), as well as the Tenth Circuit's ruling in *Jewell*.

61.  Because BLM did not make the statutorily required "excess" determination with

respect to any of the foals BLM has removed from the range—or still intends to remove from the

range as part of this roundup—the agency has authorized an action that is likely to result in the

wild horse populations in these HMAs going below the legally established low AMLs. The

likelihood of BLM driving these populations below AML in violation of federal law is

exacerbated by BLM's arbitrary and ill-explained population projections (and underlying aerial

survey methodologies)—from which BLM calculated and made its excess determination—which

vastly overestimated the number of wild horses on the range in April 2017 even as compared to

BLM's own recent population projections using similar methodologies in recent years. Thus,

BLM's decision—which will likely bring the wild horse populations below the governing AMLs—violates the Wild Horse Act, 16 U.S.C. § 1333(b)(1), BLM's own governing directives and longstanding policy and practice, *see* BLM Manual 4720.22(B); BLM Handbook at 18, and the APA, 5 U.S.C. § 706(2).

62.     BLM's action also violates the Wild Horse Act and the APA by radically departing from the agency's longstanding practice of shipping captured horses to BLM-managed facilities with public access, and instead shipping horses from this roundup to private facilities that restrict public access in several ways.  By significantly shifting its approach to wild horse removals and subsequent long-term holding of captured horses in a manner that will substantially exclude the public from this government-funded activity—without any explanation as to this precedential change in agency position—BLM violated its duties under the Wild Horse Act and the APA.

63.     For all of these reasons, BLM's action violates the Wild Horse Act and the APA. Petitioners are harmed by these violations in the manner described in paragraphs 8-16.

### Claim 2 – Violations of the 1997 Green River RMP and the 2008 Rawlins RMP, FLPMA, and the APA

64.     Petitioners hereby incorporate Paragraphs 1-58 by reference.

65.     Because BLM did not make the statutorily required "excess" determination with respect to any of the foals BLM has removed from the range—or still intends to remove from the range as part of this roundup—the agency has authorized an action that is likely to result in the wild horse populations in these HMAs going below the legally established low AMLs.  The likelihood of BLM driving these populations below AML in violation of federal law is exacerbated by BLM's arbitrary and ill-explained population projections (and underlying aerial survey methodologies)—from which BLM calculated and made its excess determination—which

vastly overestimated the number of wild horses on the range in April 2017 even as compared to

BLM's own recent population projections using similar methodologies in recent years. As a

result, BLM's decision—which will likely bring the wild horse populations below the governing

AMLs—violates the agency's own 1997 Green River RMP and 2008 Rawlins RMP, *see* Green

River RMP at 23, 73, Table 15; Rawlins RMP at 2-51, FLPMA, *see* 43 U.S.C. § 1701(a)(2),

FLPMA's implementing regulations, *see* 43 C.F.R. §§ 4710.1, 1601.0-2, BLM's own governing

directives and longstanding policy and practice, and, *see* BLM Handbook at 18, and the APA, 5

U.S.C. § 706(2). Petitioners are harmed by these violations in the manner described in

paragraphs 8-16.

### Claim 3 – Violations of NEPA and the APA

66.     Petitioners hereby incorporate Paragraphs 1-58 by reference

67.     BLM's EA and FONSI fail to analyze—or even disclose—several critically

significant features of BLM's removal action in violation of NEPA. In particular, BLM's NEPA

documents do not mention—let alone analyze—the fact that the agency intends to permanently

remove hundreds of federally protected wild horses from these HMAs *in addition to* the 1,560

horses that the agency deemed "excess" under the Wild Horse Act. Nor do the EA and FONSI

examine the significant environmental and related impacts to these hundreds of foals individually

(included the horrific trauma caused by helicopter removal of these foals), their wild horse

bands, and the social relationships between the horses in those bands, or the natural resources

located in these HMAs. BLM's decision documents also fail to analyze the fact that BLM's

action of removing hundreds of additional horses will affect adoption rates and the costs of

processing and holding since the higher number of horses will almost certainly result in more

unadopted horses. BLM's EA and FONSI also contain no discussion, analysis, methodologies,

calculations, maps, or underlying data concerning BLM's April 2017 aerial census counts—

especially as compared to recent BLM surveys showing vastly different population projections in

these HMAs—nor is there any explanation or examination as to why there is such a major

discrepancy between this year's population projection and estimates from past years. BLM's

NEPA documents also do no assess the impacts to the captured horses or the interested public of

shipping captured horses to private facilities; instead, the EA states that such horses will be

maintained at BLM-managed facilities for public observation. In addition, despite the fact that

BLM's new approaches both to removing non-excess foals from the range and shipping captured

horses to private holding facilities without public access significantly depart from longstanding

agency policy and practice, there is no explanation or analysis for these precedential shifts in

BLM approaches.

  68. For all of these reasons, BLM's Decision Record, Final EA, and FONSI violate

NEPA, 42 U.S.C § 4332(C), its implementing regulations, and the APA, 5 U.S.C. § 706(2).

Petitioners are harmed by these violations in the manner described in paragraphs 8-16.

### **PRAYER FOR RELIEF**

  WHEREFORE, Petitioners respectfully request that the Court enter an Order:

  1. Declaring that Federal Respondents have violated the Wild Free-Roaming

Horses and Burros Act, the Federal Land Policy and Management Act, the National

Environmental Policy Act, and the Administrative Procedure Act;

  2. Setting aside Federal Respondents' August 29, 207 Decision Record, Final

Environmental Assessment, and Finding of No Significant Impact, and remanding the matter to

BLM to comply with governing laws before taking any further action;

3.     Enjoining Federal Respondents from taking any further actions to round up and remove any wild horses from the public lands of the Adobe Town, Salt Wells, and Great Divide Basin HMAs, until they have fully complied with governing laws;

4.     Prohibiting Federal Respondents from permanently removing any wild horses from the public lands of the Adobe Town, Salt Wells, and Great Divide Basin HMAs not determined to be "excess";

5.     Awarding Petitioners their attorneys' fees and costs in this action; and

6.     Granting Petitioners any further relief as the Court may deem just and proper.

Respectfully submitted,

Timothy Kingston (WY Bar No. 5-2476)
LAW OFFICE OF TIM KINGSTON, LLC
620 East 27th
Cheyenne, WY 82001
(307) 638-8885 / (307) 637-4850 (fax)

William S. Eubanks II
(D.C. Bar No. 987036)
MEYER GLITZENSTEIN & EUBANKS LLP
2601 S. Lemay Ave., Unit 7-240
Fort Collins, CO 80525
(970) 703-6060 / (202) 588-5049 (fax)
beubanks@meyerglitz.com

Date: October 6, 2017                    Counsel for Petitioners

30